STATE of Wisconsin, Plaintiff-Respondent,

v.

Kerry N. AMBROSE, Defendant-Appellant.

Court of Appeals

*No. 94–3391–CR. Oral argument July 17, 1995.—Decided September 6, 1995.*

(Also reported in 540 N.W.2d 208.)

On behalf of defendant-appellant, the cause was submitted on the briefs of *Steven L. Miller* of *Miller & Miller* of Green Bay and orally argued by *Donald R. Zuidmulder* of *Zuidmulder, Appel & Gammeltoft, S.C.* of Green Bay.

On behalf of plaintiff-respondent, the cause was submitted on the brief of and orally argued by *Marguerite M. Moeller*, assistant attorney general, of Madison.

On behalf of the Wisconsin Education Association Council, an *amicus curiae* brief was filed and the cause orally argued by *Laura Amundson* and *Bruce Meredith* of Madison.

Before Cane, P.J., LaRocque and Myse, JJ.

LaROCQUE, J.   Kerry Ambrose appeals a judgment of conviction for seven counts of sexual exploitation by a therapist, contrary to § 940.22, STATS., and an order denying his motion for postconviction relief. The statute prohibits sexual contact by one who practices or purports to practice "psychotherapy" in a "professional relationship."[1] The jury found that Ambrose, the seventeen-year-old victim's high school teacher, had consensual sexual contact and sexual intercourse with the victim over a seven-week period in late 1991 and early 1992. We conclude that § 940.22, STATS., requires proof of a professional therapist-patient/client relationship. Because the evidence demonstrates only counseling within a teacher-student relationship, we reverse the judgment of conviction.

---

[1] Section 940.22(2), STATS., provides:

> Any person who is or who holds himself or herself out to be a therapist and who intentionally has sexual contact with a patient or client during any ongoing therapist-patient or therapist-client relationship, regardless of whether it occurs during any treatment, consultation, interview or examination, is guilty of a class D felony. Consent is not an issue under this section.

As provided in § 940.22(1)(i), STATS., a "Therapist" is

> a physician, psychologist, social worker, marriage and family therapist, professional counselor, nurse, chemical dependency counselor, member of the clergy or other person, whether or not licensed or certified by the state, who performs or purports to perform psychotherapy.

Section 455.01(6), STATS., defines "Psychotherapy" as

> the use of learning, conditioning methods and emotional reactions in a *professional relationship* to assist persons to modify feelings, attitudes and behaviors which are intellectually, socially or emotionally maladjustive or ineffectual. (Emphasis added.)

771

The standard for reviewing the sufficiency of the evidence to support a conviction is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

The evidence, viewed in a light most favorably toward the prosecution, establishes this version of events. Ambrose was a high school Spanish teacher. L.K. was a third-year student in his class in the fall of 1990. She was depressed and having problems getting along with her parents and sisters. L.K. approached Ambrose because he "seemed to be easy to get along with" and "I just felt I needed someone that could help me." She wanted someone who would listen to her side of the story. Although he had mentioned to his class that he was pursuing a master's degree in psychology, he never said that he was a therapist. In the spring of 1991, L.K. asked Ambrose if they could meet to "discuss personal problems."

Ambrose suggested she talk to the school guidance counselor, Mr. Hawley, but she refused because she did not feel comfortable with him. Ambrose also suggested she talk to a school psychologist, Jim French, but she feared her parents would find out. Ambrose made no promises, but said he would help her if he could. L.K. insisted on confidentiality because she did not want her parents to find out she was depressed. The first meeting occurred in his office in the school basement during the lunch hour one week later. She told him about her feelings, family problems, depression and thoughts of suicide. He listened.

They continued to meet once and sometimes twice a week during the lunch hour. Ambrose gave advice. He told her to try to get along with her parents. Ambrose used the words "counselor" and "sessions" in reference to their meetings. L.K. also expressed her feelings in writings that they would discuss. Additionally, "a couple of times" Ambrose assigned writing, like "homework." She testified, "the advice was to write down all the arguments that I had, problems that I had. That was his advice. It was to write it down." When she brought in an "assignment," they discussed it to see "how we could have done things differently to prevent an argument" or "change things to make it better."

At the end of one of the meetings, L.K. showed Ambrose slash marks on her wrists. She testified that she had not intended to injure herself and that she displayed the marks only to Ambrose. Ambrose reported the marks to Hawley, who summoned L.K. to the guidance office but agreed not to inform L.K.'s parents as long as Ambrose would continue to see her. L.K. and Ambrose then agreed that she would call him before acting on a suicidal impulse. She told Ambrose that if he discussed their meetings with anyone, she would kill herself.

At the end of the school year, Ambrose told L.K. to keep in touch over the summer. They did not plan any meetings. She called him in June, and they met once at a school park and discussed the same kinds of problems she had experienced during the school year. She called him again at the end of the summer "just to let him know how I was doing."

In the fall of 1991, L.K., now a seventeen-year-old senior, again was Ambrose's student. She approached him, and they agreed to begin meeting again. They met

in his office during lunch "a couple of times." He gave advice. She testified, "if the talk was suicidal, he would say, you know, life is worth living. Hang on. He might tell me to, you know, just—I don't know. Just friendly advice. You know, maybe to be more cooperative with my parents, not to argue as much with my sisters, things like that." Ambrose had her write a "no-send" letter to her father. L.K. testified, "When you write a no-send letter to whoever you're upset with, you write down everything that you'd like to say to that person, but you don't send it." She testified that Ambrose tried to help her "work through" her feelings and "get over my anger towards my dad." Ambrose used the term "dumping," meaning telling someone something "at the last second, like the last minute before you get ready to leave." Ambrose never criticized her "personal feelings," but listened to what L.K. said without contradicting her or saying her feelings were illogical or unreasonable.

At the end of October, Ambrose was no longer coaching football after school. They decided to meet after school. Sexual contact began. Each time L.K. met with Ambrose in November and early December, sexual contact occurred following the same pattern. They would talk in a classroom, then walk together to his basement office for Ambrose's coat. He would hug her, have her sit on his knee and kiss her. Then he would apologize and say he would not do it again. They would stay in the office for "a minute or two."

Ambrose also told L.K. about "the three stages." "He said the first stage was he wanted to hug me as to protect me from everything that was happening. The second stage was that he wanted to shake me if I was reluctant to tell him or to give information to him. And the third stage was to kiss me and do sexual things."

Ambrose began discussing his problems. "He said I could help him and he could help me . . . ." In early December, Ambrose became ill and L.K. testified she was afraid he might be getting ulcers from the stress of worrying about her suicidal tendencies.

During meetings after school in mid-December, Ambrose made her put her hand on his penis, asked her to "kiss his penis," which she refused to do, and had oral contact with her vagina. On December 31, during Christmas break, she called Ambrose and asked if she could talk to him. They arranged to meet at his house. L.K. gave him "writings": suicide notes for her parents, and a letter telling Ambrose how dependent she was on him. She asked him to keep the notes to her parents without reading them. He had intercourse with her. They then talked about why she was having a bad Christmas with her family. She stayed for one and one-half to two hours. They met again at school twice in January, and each time Ambrose touched her in a sexual way.

L.K. testified that Ambrose played an important role in assisting her to ask for professional help. Ambrose had asked a student who had been treated for depression to talk with L.K. about getting professional care. Near the end of January, L.K., the student and Ambrose agreed she should go to a hospital for a "depression screening." Eventually a hospital psychiatrist referred L.K. to a therapist. She began to meet with the therapist every week. The meetings with Ambrose stopped. L.K. testified

> He told me that he would leave it up to me. He didn't want to interfere with [the] therapy work that she was doing with me. So we left it up to me to—if I wanted to talk to him. He said he was interested

still. He wanted to know what she had me doing and how it was going.

. . .

[But] it would be best that I only talk to [the therapist] and not have two counselors.

L.K. felt hurt and rejected. In April 1992 she told her therapist about sexual contact with Ambrose. The jury obviously did not believe Ambrose's testimony denying sexual conduct. Ambrose was convicted of seven counts of violating § 940.22(2), STATS.[2] Other relevant evidence is described in the following discussion.

The construction of a statute presents a question of law this court considers without deference to the trial court. *State v. Pham*, 137 Wis. 2d 31, 34, 403 N.W.2d 35, 36 (1987). If a statute is not ambiguous, we look to the statutory language for its meaning. *See In re T.P.S.*, 168 Wis. 2d 259, 263, 483 N.W.2d 591, 593 (Ct. App. 1992). A statute is ambiguous only if it is capable of two or more reasonable interpretations. *Id.* at 264, 483 N.W.2d at 593. That the parties disagree about its meaning does not necessarily make it ambiguous. *Milwaukee Fire Fighters' Ass'n, Local 215 v. Milwaukee*, 50 Wis. 2d 9, 14, 183 N.W.2d 18, 20 (1971). Moreover, the provisions of a statute are not rendered ambiguous simply because they are difficult to apply to the facts of a particular case. *See Lawver v. Boling*, 71 Wis. 2d 408, 422, 238 N.W.2d 514, 521 (1976).

---

[2] The first jury trial ended in a mistrial. The State's motion to amend the information shortly before the scheduled second trial to include a misdemeanor count of sexual intercourse with a child age 16 or older in violation of § 948.09, STATS., was denied as untimely.

■ We conclude that § 940.22, STATS., is not ambiguous in respect to the "professional relationship" required in the performance of psychotherapy. The actor and the victim must be engaged in a professional *therapist-patient / client* relationship. First, § 940.22(2), STATS., prohibits sexual contact during an "ongoing therapist-patient or therapist-client relationship"; a therapist is defined as one who performs or purports to perform "psychotherapy"; psychotherapy, by virtue of its adopted meaning found in § 455.01(6), STATS., can occur only during a "professional relationship." This last definition is found in ch. 455, STATS., dealing with the regulation and licensing of psychologists. We conclude that the only reasonable meaning of the requirement for an ongoing therapist-patient/client relationship in the criminal statute is that of a *professional* therapist-patient/client association.

■ Other statutory language and the rule of *ejusdem generis* support our conclusion. The meaning of a general phrase following the enumeration of specific classes is limited to "things . . . of the same kind, class, character, or nature . . . ." *Cheatham v. State*, 85 Wis. 2d 112, 118, 270 N.W.2d 194, 197 (1978) (quoting 73 AM.JUR.2D *Statutes* § 214 at 408). In this case, Ambrose was ostensibly included within the reference in § 940.22(1)(i), STATS., to an "other person." The kind of professions the statute specifies: "a physician, psychologist, social worker, marriage and family therapist, professional counselor, nurse, chemical dependency counselor, member of the clergy" are closely associated with the traditional profession of therapeutic psychology. The named occupations traditionally and intrinsically employ psychotherapy as a method to

accomplish the very purpose of the profession. Psychotherapy is a part of the common perception of the duties of these occupations, and it is presumably part of the education and training as well. The teaching profession is not ordinarily associated with psychotherapy, and there was no evidence that psychotherapy is part of the training, education or expertise of teachers.[3] A teacher who conducts informal counseling, even one with a degree in psychology, is not engaged as a professional therapist. Ambrose's meetings with L.K. were ad hoc, loosely structured, and stopped altogether during school vacations or when other duties, such as coaching football, intervened. Ambrose did not purport to take a patient history, make a diagnosis, make notes of meetings, develop a treatment plan or charge a fee.

The prosecution presented expert opinion testimony that Ambrose employed some "therapeutic techniques": He had L.K. write a "no-send letter," he had her write out problems or arguments "a couple" of times, they had an agreement that she call him before committing suicide and he listened. The use of these established techniques alone, especially when those techniques reflect common sense as well as expertise,

---

[3] Current federal law prohibits the required use of psychological exams, testing or treatment of students in federally funded education programs. The United States Code prohibits any requirement that students

> submit to psychiatric examination, testing, or treatment, or psychological examination, testing, or treatment, in which the primary purpose is to reveal information concerning:
>
>  . . . .
>
> (2) mental and psychological problems potentially embarassing to the student or his family . . . .

20 U.S.C.A. § 1232(h) (1990).

does not constitute sufficient evidence of the required professional relationship. A number of other factors are relevant, and no evidence of these factors is present in this case: Ambrose did not hold himself out as a therapist, publicly or privately; he was not trained or experienced in the field; he was neither employed nor compensated for the services. This court concludes that the evidence failed to establish that Ambrose's counseling took place in a professional therapist-client relationship. We do not mean to suggest that other persons, including teachers, are incapable of performing or purporting to perform psychotherapy. If the record, viewed as a whole, establishes sufficient evidence of the preceding factors, a person, who happens to be a teacher, may be liable under § 940.22, STATS.

Although an absolute legislative ban against teacher-student sexual contact may well be advisable, and while Ambrose's conduct may be deserving of more than the misdemeanor punishment provided by § 948.09, STATS. (prohibiting consensual sexual intercourse with a child sixteen years of age or older), a resolution of those matters is not the issue on this appeal. Because the evidence shows that Ambrose was not acting in a professional therapist-patient/client relationship, the conviction must be reversed. We do not address Ambrose's argument that that statute is unconstitutionally vague and overbroad.

*By the Court.*—Judgment and order reversed.