HECHT, Justice
(concurring in part and dissenting in part).
I concur in that part of the majority’s opinion reversing the district court’s ruling denying Patrick Edouard’s request for in camera review of W.B.’s counseling records. I respectfully dissent from the remainder of the majority’s opinion because I believe Edouard was prejudiced by the district court’s failure to properly instruct the jury and its abuse of discretion in excluding expert testimony that' would have been helpful to the jury and essential to the defense. I would therefore reverse the convictions and remand for a new trial.
Edouard served as the pastor of the Covenant Reformed Church in Pella, Iowa, from 2003 to 2010. At various times during that seven-year period, Edouard engaged in sexual relationships with four female members of his congregation. ’ Details of the relationships first emerged in December 2010, and in the next few weeks, Edouard and each of the four women had confessed the relationships to their church elders.
In January 2011, the women attended group therapy sessions in which they discussed with each other their relationships with Edouard. After attending the therapy sessions, the women filed a report with the Pella police department, alleging each “was the subject of [Edouard’s] counseling and pastoral care.” Edouard was later charged with four counts of sexual exploitation by a counselor or therapist, in violation of Iowa Code section 709.15(2)(c); one count of a pattern, practice, or scheme to engage in sexual exploitation by a counsel- or or therapist, in violation of Iowa Code section 709.15(2)(a); and three counts of third degree sexual abuse, in violation of Iowa Code section 709.4(1).
Before trial, the State moved to limit the expert testimony of Dr. Hollida Wakefield, an expert offered by Edouard to explain several features of the relationships to the jury and to aid him in presenting his defense that he had not been providing mental health services, for purposes of the statute, in any of the four relationships. More specifically, the State sought to exclude any testimony about differences be *456 tween pastoral care and pastoral counseling and any testimony indicating Edouard may have been engaged in the former, but not the latter, with each of the women. That testimony, the State argued, would be unhelpful and misleading to the jury and would constitute an improper legal conclusion. The district court granted the motion, concluding Wakefield’s definitions would be of no assistance in explaining the statutory meanings of mental health services or counseling to the jury and would improperly invade the “function of the jury.”
At trial, Edouard contended he had not, in any of the four relationships, acted as a “counselor or therapist” providing “mental health services” under the meaning of section 709.15. He moved for judgment of acquittal at the conclusion of the prosecution’s case, and later renewed the motion at the conclusion of the trial, contending the State had failed to present sufficient evidence of sexual exploitation under the requirements of the statute. The district court denied these motions.
Upon conclusion of the ten-day trial, Edouard submitted to the court a proposed marshaling instruction for the jury. His proposed instruction enumerated the specific professions set forth in the definition of “counselor or therapist” in section 709.15(l)(a.), with additional language clarifying that the definition required a “formal counseling relationship.” Edouard also requested an instruction indicating a conviction under section 709.15 required proof that one or more of the women had been his “patient or client.” Finally, he requested an instruction defining “mental health services” and incorporating definitions we have used in previous eases for the statutory terms “treatment,” “assessment,” and “counseling.” The district court denied these requests and gave its own less detailed instructions over Edouard’s objection.
After deliberation, the jury found Edouard guilty of each of the four counts of sexual exploitation by a counselor or therapist and guilty of the pattern or practice count. He was acquitted of the three counts of sexual abuse.
Edouard appealed the convictions, and we transferred the case to the court of appeals. Along with challenges to the district court’s rulings on his expert evidence and his proposed marshaling instructions, Edouard raised additional evidentiary challenges and a constitutional challenge to the application of section 709.15 to his conduct and to other members of the clergy engaging in similar conduct. The court of appeals concluded the trial court had abused its discretion in declining to give Edouard’s proposed instruction on “mental health services,” found Edouard had suffered prejudice as a result of the error, and reversed the convictions. Although unnecessary to its resolution of the case, the court of appeals also noted the district court had erred in excluding the portions of Dr. Wakefield’s testimony regarding pastoral care and pastoral counseling. Having resolved the case on the instructional ground and given guidance regarding the expert testimony, the court of appeals declined to reach Edouard’s other challenges. I believe the court of appeals correctly decided these issues, and I would affirm its opinion for the reasons explained below.
Section 709.15 prohibits a “counselor or therapist” from engaging in a number of enumerated forms of sexual conduct with an “emotionally dependent patient or client” who receives “mental health services” from the counselor or therapist. See Iowa Code § 709.15(2)(c) (2013). The section defines “counselor or therapist” as
*457 a physician, psychologist, nurse, professional counselor, social worker, marriage or family therapist, alcohol or drug counselor, member of the clergy, or any other person, whether or not licensed or registered by the state, who provides or purports to provide mental health services.
Id. § 709.15(l)(a). “Mental health service” is defined as “the treatment, assessment, or counseling of another person for a cognitive, behavioral, emotional, mental, or social dysfunction, including an intrapersonal or interpersonal dysfunction.” Id. § 709.15(l)(d). A “patient or client” is “a person who receives mental health services from the counselor or therapist.” Id. § 709.15(l)(e). The provision also provides a meaning for “emotionally dependent,” defining it as “the nature of the patient’s ... emotional condition or the nature of the treatment provided ... is such that the counselor or therapist knows or has reason to know that the patient ... is significantly impaired in the ability to withhold consent.” Id. § 709.15(1)(6).
In examining the application of section 709.15 to specific relationships in the past, we have explained we must assess not just isolated words and phrases in the statute, but the section in its entirety, and we must look for an interpretation best achieving the statute’s purpose. State v. Gonzalez, 718 N.W.2d 304, 308 (Iowa 2006). In discerning the meaning of the phrase “mental health services,” we have noted it cannot “encompass strictly personal relationships involving the informal exchange of advice.” State v. Allen, 565 N.W.2d 333, 337 (Iowa 1997). Instead, when we have analyzed the meaning and purpose of section 709.15 in the past, we have emphasized the specialized, technical meaning of mental health services and its close association with forms of therapy provided by professionals. Id.; Gonzalez, 718 N.W.2d at 308-09.
In Allen, for example, we encountered a case of a woman who suffered severe emotional problems in connection with significant marital strain and due, at least in part, to physical and mental abuse she had suffered as a child. Allen, 565 N.W.2d at 335. She had been hospitalized frequently in the course of dealing with these problems and had several times attempted suicide. Id. After a particularly challenging pregnancy and pregnancy-related surgery, she began to experience physical symptoms, which went unabated despite medical and psychiatric treatment. Id. Eventually, she sought the assistance of an unlicensed hypnotherapist. Id. In several lengthy meetings over the course of four months, the hypnotherapist supplied her with alcoholic beverages and initiated and escalated intimate physical contact with her, assuring her “that such physical contact would help her to recover from the effects of the sexual abuse she had endured as a child.” Id.
The hypnotherapist was eventually charged with and convicted of sexual exploitation under section 709.15. Id. at 336. On appeal, the hypnotherapist did not deny that he was a counselor or therapist for purposes of the statute, and likewise, did not dispute that he had provided, or at least purported to provide, mental health services. Id. Instead, he contended section 709.15 was unconstitutionally vague. Id. Analyzing section 709.15 for purposes of that contention, we explained we would not entertain the “challenge unless the statute reache[d]” a significant amount of protected conduct. Id. at 337. We concluded section 709.15 presented no such danger of substantial encroachment, because it clearly did not reach “informal exchange of advice” or “ordinary conversations.” Id. Moreover, we explained, the statute would not typically apply to “innoc *458 uous event[s]” in “romantic relationship[s],” and would rarely, “if ever, apply to a marriage relationship.” Id. at 388. The relationship at issue in Allen was much different, we explained: the hypnotherapist had at all times been acting “[a]s a therapist,” and in a “professional role[ ].” Id. at 337 n. 2. Later in our analysis of the hypnotherapist’s challenges to his convictions, we emphasized the victim had sought the hypnotherapist out for help with her physical symptoms associated with her long history of mental health problems, and that he had engaged in his problematic contact with her while she was “in his office for treatment” for these issues. Id. at 339. Given those indications of a professional treatment relationship, we affirmed the hypnotherapist’s convictions. Id. at 340.
In Gonzalez, we had occasion to analyze the meaning of the phrase “mental health services” more directly and extensively, as the defendant challenged directly, in a pretrial motion to dismiss, the allegations that he had been working as a counselor or therapist and had been providing mental health services. Gonzalez, 718 N.W.2d at 307-08. The defendant in Gonzalez worked as a nursing assistant in the psychiatric unit of the University of Iowa Hospitals and Clinics, and had been charged with sexual exploitation as a result of invasive physical contact with a female patient. Id. at 306. The trial court granted the nursing assistant’s motion to dismiss, determining the assistant had not, even accepting various allegations by the State as true, been providing mental health services within the meaning of section 709.15. Id. The State appealed. Id.
Analyzing on appeal the nursing assistant’s contention he had not been providing mental health services, we parsed the phrase’s component parts of “treatment,” “assessment,” and “counseling” “for certain dysfunctions.” Id. at 308. We consulted a dictionary to illuminate the meanings of these terms and recognized each incorporated a specific, technical meaning, typically associated with professional diagnostic and therapeutic modalities, for purposes of the statute. Id. Armed with that understanding, we concluded the nursing assistant might reasonably be found to have provided treatment for purposes of section 709.15, given the allegations that he performed essential tasks in “providing care of psychiatric patients,” he assisted in “providing for a therapeutic environment,” and he participated “in planning patient care.” Id. Similarly, we explained, he may have provided assessment “because he performed nursing tasks to assist in monitoring psychiatric patients,” and had assisted with the documenting and reporting of patient behavior. Id. Most importantly, we emphasized, the nursing assistant might reasonably be found to have provided “treatment and assessment” to the patient because he had performed his tasks while she was admitted in the psychiatric unit for psychiatric care. Id. at 308-09. Given the existence of that professional treatment environment and relationship, we concluded, the nursing assistant’s provision of certain services might reasonably have “qualifie[d] him as a ‘counselor’ or ‘therapist’ for purposes of Iowa Code section 709.15,” and thus we reversed the district court’s dismissal and remanded for trial. Id. at 310.
Emerging from these analyses is a clear picture of the meaning of section 709.15 and its counselor or therapist and mental health services requirements. The statute proscribes certain specified forms of conduct undertaken in the course of specialized, formal treatment relationships and environments. See id. at 308-09 (emphasizing the victim’s presence in the psychiatric unit, the “therapeutic relationship,” and the “therapeutic environment”). The *459 structure and language of section 709.15 and related provisions in the Iowa Code illuminate this understanding. The section’s requirement that the conduct occur between the counselor or therapist and a “patient or client” of the counselor or therapist, for example, plainly implicates a professional relationship, indicating the statute reaches only those relationships rising to the level of a formal professional treatment relationship. See, e.g., Iowa Code § 709.15(2)(6) (proscribing certain conduct with an “emotionally dependent patient or client” or an “emotionally dependent former patient or client”).
The statutory definition of “emotionally dependent” is also instructive in my analysis, providing the emotional dependence required for an exploitation charge must arise from the nature of a patient’s emotional condition or “the nature of the treatment provided by the counselor or therapist.” Id. § 709.15(1)(6) (emphasis added). We noted in Gonzalez that a standard meaning of “treatment” is “ ‘the action or manner of treating a patient medically or surgically.’ ” Gonzalez, 718 N.W.2d at 308 (quoting Webster’s Third New International Dictionary 2434-35 (unabr. ed.2002)). •' The incorporation of this specialized concept in the statutory definition of emotionally dependent suggests section 709.15 reaches a specific class of formal therapeutic relationships— namely, those relationships where the services provided may be characterized as constituting formal professional treatment. See Iowa Code § 709.15(1)(6). The related civil damages provision, setting forth the statute of limitations for damages claims brought in connection with sexual exploitation charges, underscores that understanding, in providing “action[s] ... shall be brought within five years of the date the victim was last treated by the counselor or therapist.” Id. § 614.1(12) (emphasis added).
Section 709.15 very clearly bounds the categories of actors and types of relationships that may run afoul of the statute in setting forth its definition of “counselor or therapist.” Physicians, psychologists, nurses, professional counselors, social workers, marriage and family therapists, and alcohol and drug counselors, I recognize, fill specialized, technical roles in the realm of psychiatric care, and perform highly specialized functions in providing professional mental health services for clients and patients. The definition of “counselor or therapist” itself emphasizes as much, incorporating the specialized elements of treatment, assessment, and counseling we parsed in Gonzalez in identifying these professionals as providers of mental health services. Id. § 709.15(l)(a). The longstanding inclusion of clergy in this class should not alter this understanding, as several sections of the Iowa Code and administrative rules indicate clergy, in certain contexts, may provide precisely these kinds of formal therapeutic mental health services. See, e.g., id. § 154D.4(1) (noting clergy may provide mental health counseling in accordance with standards in their profession); Iowa Admin. Code r. 481— 53.15(l)(a.) (noting spiritual counseling in hospice environment shall be provided in accordance with an “interdisciplinary plan of care”).
Various provisions in the Iowa Code addressing similar subject matter highlight the specialized nature of the services these classes of professionals provide and the specific training they typically undergo. See, e.g., Iowa Code § 135H.1(5) (setting forth eoursework and clinical training requirements in defining “mental health professional” for purposes of chapter addressing psychiatric medical institutions); id. § 154D.4(1) (establishing that certain statutory licensing requirements do not prevent “nurses, psychologists, social *460 workers, physicians ... or members of the clergy, from providing or advertising that they provide services of a marital and family therapy or mental health counseling nature consistent with the accepted standards of their respective professions ” (emphasis added); see also id. § 135G.1(6) (defining mental health services as “services provided by a mental health professional operating within the scope of the professional’s practice which address mental, emotional, medical, or behavioral problems”); Ingeborg E. Haug, Boundaries and the Use and Misuse of Power and Authority: Ethical Complexities for Clergy Psychotherapists, 77 J. of Counseling & Dev. 411, 411 (1999) (“Clergy psychotherapists are defined as mental health professionals who have received dual education and training as clergy and as psychotherapists (the term clergy encompasses Christian and non-Christian religions).”). Similarly, numerous administrative rules indicate these classes of actors generally receive substantial training and typically fill specialized, technical roles in diagnosing and ameliorating specific mental health dysfunctions. See, e.g., Iowa Admin. Code r. 441 — 88.61 (defining “mental health services” as “those clinical, rehabilitative, or supportive services provided by an individual, agency, or other entity that is licensed, accredited, certified, or otherwise approved as required by law to treat any mental disorder listed in the International Classification of Diseases”); id. r. 645 — 31.1 (defining “mental health setting,” for purposes of licensure of marital and family therapists, as “a behavioral health setting where an applicant is providing mental health services including the diagnosis, treatment, and assessment of emotional and mental health disorders and issues”); id. r. 645 — 31.5 (marital and family therapists); id. r. 645 — 280.5 (social workers); id. r. 653— 9.3 (physicians); id. r. 655 — 6.1 (registered and practical nurses). The enumeration of these classes of professionals in section 709.15, the corresponding exclusion of other categories of actors, and the indications in section 709.15, other related sections of the Iowa Code, and the administrative rules, of the types of services these professionals provide highlight the formal therapeutic and diagnostic nature of the relationships contemplated by the statute.
A survey of related statutes and jurisprudence in sister jurisdictions augments my understanding that section 709.15 is calculated to criminalize conduct in formal treatment relationships in which therapeutic mental health services are provided, or in which the defendant has purported to provide such services. A few states have sexual exploitation statutes broader than ours, criminalizing conduct between various enumerated actors and certain vulnerable individuals, without requiring a formal professional therapeutic relationship. See, e.g., Ark.Code Ann. § 5-14-126(a)(l)(C) (West, Westlaw through 2014 Fiscal Sess.) (mandated reporters and clergy members); Tex. Penal Code Ann. § 22.011 (b)(l0) (West, Westlaw through 2013 Third Called Sess.) (requiring, in case of clergyperson, merely a role “as spiritual adviser”). See generally Bradley J.B. Toben & Kris Helge, Sexual Misconduct with Congregants or Parishioners: Crafting A Model Statute, 1 Brit. J. Am. Legal Stud. 189, 209-10 (2012) [hereinafter Toben & Helge] (“Of [thirteen jurisdictions with sexual exploitation statutes], only two have language that is designed to criminalize such conduct by clergypersons outside of the counseling context.”). Arkansas, for example, criminalizes conduct when a person is a “mandated reporter [of child maltreatment] or a member of the clergy and is in a position of trust or authority over the victim and uses the position of trust or *461 authority to engage in [proscribed conduct].” Ark.Code Ann. § 5-14-126(a)(1)(C). The Arkansas statute provides no further definition of “trust or authority,” contains no mental health services requirement, contains no patient or client requirement, and enumerates a list of relevant actors far longer and more inclusive than the list enumerated in' our own statute. Compare id. § 5-14-126(a), with Iowa Code § 709.15(l)(a); see also H.F. 682, 78th G.A., Reg. Sess. (Iowa 1999) (proposing an “exploitation by a person in authority” statute which would have applied, had it been adopted, to relationships with certain school-aged juveniles). ■
Other states, by contrast, have more narrowly drawn exploitation statutes, more closely resembling our own. See, e.g., Conn. Gen.Stat. Ann. § 53a-65(9) (West, Westlaw through 2014 Feb. Reg. Sess.) (enumerating in its definition of “psychotherapist” traditional classes of mental health providers and adding hypnotists); N.D. Cent.Code Ann. § 12.1-20-06.1(2) (West, Westlaw through 2013 Reg. Sess.) (defining “therapist” to mean “a physician, psychologist, psychiatrist, social worker, nurse, chemical dependency counselor, member of the clergy, or other person, whether licensed or not by the state, who performs or purports to perform psychotherapy”); S.D. Codified Laws § 22-22-27(3) (West, Westlaw through 2014 Reg. Sess.) (defining “psychotherapist” to include various traditional classes of mental health professionals, and including clergy-members, marriage and family therapists, and other “mental health services provider[s]”); Utah Code Ann. § 76-5-406(12) (West, Westlaw through 2014 Gen. Sess.) (enumerating specific classes of professional providers and requiring act “committed under the guise of providing professional diagnosis”); Wis. Stat. Ann. § 940.22; see also id. § 455.01(6) (West, Westlaw through 2013 Wis. Act. 380) (defining “psychotherapy” to include specific methods and functions performed in “professional relationship”). By enumerating certain professional classes of actors, including clergy, while defining mental health services or its analog, psychotherapy, in terms of the technical therapeutic function being performed, these statutes underscore the technical nature of the relationships they cover.
Of course, as the majority points out, the definition of “counselor or therapist” in section 709.15 does not require state li-censure or registration, and makes reference to “any” individuals who provide or purport to provide mental health services. Those indications, however, should not alter the foregoing analysis. In both Gonzalez and Allen, we very clearly considered individuals operating in occupational classes not explicitly identified in the definition of “counselor or therapist,” and yet we examined the nature of the relationship and the nature of the environment in each scenario to ensure the interaction rose to the level of a formal therapeutic relationship. See Gonzalez, 718 N.W.2d at 308; Allen, 565 N.W.2d at 337. As explained, section 709.15 limits its coverage in using and defining the term “counselor or therapist” — the statute very clearly does not use or define the term “any person,” or “any person who provides mental health services,” or “any person in a position of power or authority.” Moreover, the definition of counselor or therapist has not been set forth so generally as to cover merely , “any person who provides mental health services,” as our general assembly has clearly identified instructive classes of actors before including the less specific “any other person” language. As we have explained on numerous occasions, the “any other person” language must be read in the context of the language surrounding it. See, e.g., Sorg v. Iowa Dep’t of Revenue, *462 269 N.W.2d 129, 182 (Iowa 1978) (“Under the applicable rule of Noscitur a sociis, the meaning of a word in a statute is ascertained in light of the meaning of words with which it is associated.”)- In this case, the language preceding “any other person” indicates specific classes of actors who engage in professional therapeutic relationships. Any faithful reading of the remaining language in the definition must incorporate the same lexical cues and constraints — much like we incorporated them in our analyses in Allen and Gonzalez.
At least one court, analyzing the reach of its specialized relationship requirement, has concluded its statute can only be read to cover relationships “closely associated with the traditional profession of therapeutic psychology,” and relationships in which professionals employ “therapeutic techniques” in performing or purporting to perform “psychotherapy.” State v. Ambrose, 196 Wis.2d 768, 540 N.W.2d 208, 212 (Wis.Ct.App.1995). The court in Ambrose considered a case involving a high school teacher who was pursuing a master’s degree in psychology. Id. at 210. A student had approached him and asked for help with her depression and related family problems. Id. He began meeting with her a few times a week, and at these meetings she “told him about her feelings, family problems, depression and thoughts of suicide.” Id. The relationship lasted several months, was briefly interrupted by summer vacation, and eventually escalated into a sexual relationship. Id. at 210-11. The teacher was charged and convicted under Wisconsin’s sexual exploitation statute, which prohibits sexual contact between “[a]ny person who is or who holds himself or herself out to be a therapist and who intentionally has sexual contact with a patient or client during any ongoing therapist-patient or therapist-client relationship.” Id. at 209 n. 1; see also Wis. Stat. Ann. § 940.22(2).
The Ambrose court found several factors persuasive in concluding its statute could not reach the teacher’s conduct. First, the court noted a professionalism requirement in its statutory definition of psychotherapy, which required “ ‘the use of learning, conditioning methods and emotional reactions’ ” “ ‘to assist persons to modify feelings, attitudes, and behaviors.’ ” Id. at 209 n. 1, 212 (quoting Wis. Stat. Ann. § 455.01(6)). Second, the court highlighted the statute’s enumeration of the relevant categories of actors, which read as follows: “ ‘physician, psychologist, social worker, marriage and family therapist, professional counselor, nurse, chemical dependency counselor, member of the clergy.’ ” Id. (quoting Wis. Stat. Ann. § 940.22(l)(i)). Those professionals, the court explained, “are closely associated with the traditional profession of therapeutic psychology,” indicating the statute’s coverage of relationships accomplishing the specialized “purpose of the profession” of psychotherapy. Id. at 212. Third, the court noted there was no evidence psychotherapy was typically a “part of the training, education or expertise” for teachers. Id. Fourth, the court observed that an individual “who conducts informal counseling, even one with a degree in psychology, is not engaged as a professional therapist.” Finally, the court explained, the teacher had never held himself out as a therapist publicly or privately; he, much like most other teachers, was not trained or experienced in the field of psychotherapy; and he was neither employed nor compensated for the performance of psychotherapy services. Id. For those reasons, the court concluded, the evidence failed to establish the “counseling” performed by the teacher had reached the level of professional psychotherapy, and the court therefore reversed his convictions. Id.
*463 The Ambrose court’s analysis of Wisconsin’s narrowly drawn statute squares convincingly with my understanding of our own narrowly drawn statute. Various cues in section 709.15, including the limited enumeration of specific classes of professionals, the patient ,'or client requirement, the incorporation of specific terms in the definition of mental health services implicating specialized, formal forms of therapy, and the numerous other statutory cues implicating technical, professional forms of therapy indicate our statute reaches only formal professional therapeutic relationships. ■ If we conclude otherwise — if we, for instance, conclude our statute covers less formal relationships, regardless whether they might be characterized as involving “counseling” or other forms of mental health services, as the majority appears to suggest — we must confront constitutional problems of overbreadth and vagueness, and might, in cases involving clergy members, encounter entanglement and other constitutional issues.[11] See, e.g., *464 Allen, 565 N.W.2d at 387 (explaining statute may be unconstitutional if it reaches “substantial amount of protected conduct” (internal quotation marks omitted)); State v. Bussmann, 741 N.W.2d 79, 91-92 (Minn. 2007) (concluding sexual exploitation statute was unconstitutional as applied to clergy member, and noting it might reach any relationship in which clergy member and congregant had sexual contact “if the two were also, as would seem likely, discussing spiritual or religious matters on an ongoing basis”); cf. Carter v. Broadlawns Med. Ctr., 857 F.2d 448, 457 (8th Cir.1988) (“[T]he record established that Chaplain Rogers also provides a significant amount of purely secular counseling to the employees. She testified that her exchanges with staff members primarily involved assisting the employees with personal problems, such as letting off steam about supervisors, dealing with gossip and teen-age children, and venting grief over loss of a family member. Chaplain Rogers viewed her service as giving support and encouragement, and she stated that it was relatively rare for these interactions to assume a religious nature”).
As we have explained on numerous occasions, our doctrine of constitutional avoidance compels us to avoid constitutionally impermissible constructions of statutes where possible. See, e.g., State v. Dist. Ct., 843 N.W.2d 76, 85 (Iowa 2014). My understanding of section 709.15 and its coverage of formal professional therapeutic relationships avoids implication of the issues recognized in Allen and Bussmann, *465 and is consistent with our general preference for steering clear of constitutionally problematic constructions. See, e.g., Toben & Helge, 1 Brit. J. Am. Legal Stud, at 215 (“Numerous state legislatures such as [those in] Kansas and Texas have recently proposed or passed bills into law to attenuate this sexual misconduct problem, however, most of these bills passed into law include language that requires a court to interpret church policy or doctrine. Consequently, these laws have either encountered or potentially could meet constitutional entanglement issues.”); see also Robert J. Basil, Note, Clergy Malpractice: Taking Spiritual Counseling Conflicts Beyond Intentional Tort Analysis, 19 Rutgers L.J. 419, 444-45 n. 96 (1988) (“Analogy to medical malpractice is appropriate ... when the standard addresses a procedural duty which is based on a duty of professionalism, rather than religious beliefs”).
I would therefore take this occasion to reiterate our longstanding recognition that section 709.15 has been narrowly drawn to reach only formal therapeutic relationships. See Gonzalez, 718 N.W.2d at 308 (concluding establishment of “therapeutic relationship[ ]” with psychiatric patient could constitute treatment for purposes of section 709.15); Allen, 565 N.W.2d at 337 (explaining statute does not reach relationships “involving the informal exchange of advice[]”). Further, I would emphasize the statute has set forth several specific requirements to ensure an interaction rises to the level of covered formal professional relationship including, but not limited to: the actor must fit comfortably within the classes of professionals enumerated in the definition of “counselor or therapist”; the emotional dependence must arise from a specific kind of emotional condition or from a specific course of treatment provided by the counselor or therapist; the alleged victim must be or have been a “patient or client” of the counselor or therapist; and the treatment provided by the actor must be consistent with and rise to the level of the specific diagnostic and therapeutic services contemplated by the terms incorporated in the statutory definition of “mental health services.” See Iowa Code § 709.15; see also Gonzalez, 718 N.W.2d at 308. Edouard’s entire defense was based on the propositions that (1) he and the State’s complaining witnesses did not have a formal treatment relationship of the type covered by the statute, and (2) he did not provide, or purport to provide, mental health services to clients or patients. With these principles, requirements, and contentions in mind, I turn to Edouard’s challenges regarding the marshaling instructions and the district court’s ruling on the proffered expert testimony.
A. Marshaling Instructions. Under Iowa law, the trial court must provide the jury with instructions setting forth the law applicable to all material issues in a case. State v. Marin, 788 N.W.2d 833, 837 (Iowa 2010). In addition, the court must give a requested instruction when it states a correct rule of law applicable to the facts of the case and the concept is not otherwise conveyed in other instructions. Id. We have not required the trial court give any particular form of instruction; instead, we have explained the court must give instructions fairly stating the law as it applies to the facts of the case before it. Id. at 838.
Here, the district court instructed the jury as follows:
The State must prove each of the following elements of Sexual Exploitation by a Counselor or Therapist as to [alleged victim]:
1. On or about January, 2006, through 2008, the defendant engaged in sexual conduct with [alleged victim].
*466 2. The defendant did so with the specific intent to arouse or satisfy the sexual desires of either the defendant or [alleged victim].
3. The defendant was then a counselor or therapist.
4. [Alleged victim] was then receiving mental health services from the defendant, or had received mental health services from the defendant within one year prior to the conduct.
The court added an instruction defining “counselor or therapist” as including “a member of the clergy, or any other person, whether or not licensed or registered by the State, who provides or purports to provide mental health services.” The court also provided the following definition for “mental health services”:
the providing of treatment, assessment, or counseling to another person for a cognitive, behavioral, emotional, mental or social dysfunction, including an intra-personal or interpersonal dysfunction. It does not include strictly personal relationships involving the informal exchange of advice, nor does it include the giving of general spiritual advice or guidance from a clergy member to congregants. It contemplates a counseling relationship with the clergy member established for the purpose of addressing particular mental, intrapersonal or interpersonal dysfunctions.
Edouard objected to these instructions on the grounds they failed to convey the patient or client requirement set forth in the statute, failed to convey the scientific definitions of the specific terms incorporated in the statutory definition of “mental health services” we relied on in Gonzalez, and failed to convey the statute’s enumeration of specific professional classes of actors in defining “counselor or therapist.” He proposed a modified set of instructions incorporating each of these elements, but the court declined to adopt them. On appeal, Edouard reiterates his contentions and argues the district court abused its discretion in declining to give his proposed instructions.
Based on my review of the explicit statutory requirements and the principles articulated in our caselaw, I conclude Edouard’s contentions have merit. The “patient or client” requirement, for example, was very plainly applicable to Edouard’s defense and his proposed instruction accurately stated the relevant law. The requirement is set forth both in the statute itself and in the relevant pattern criminal jury instructions. See Iowa Code § 709.15(l)(e); Iowa State Bar Ass’n, Iowa Crim. Jury Instruction 920.3 (2013). While the district court’s instructions incorporated a requirement that the alleged victims had received mental health services from Edouard, consistent with the statutory definition of patient or client, they failed to include the important statutory “patient or client” language itself. As I have explained above, this language is crucial to understanding section 709.15, as it explicitly emphasizes the formal professional therapeutic relationship contemplated by the statute. It was the State’s burden to prove more than the fact that Edouard met and spoke with the four women about intensely personal matters. The meetings and conversation must have been in the context of a formal professional therapeutic relationship in which the women became Edouard’s patients or clients — not merely members of his congregation. Lacking specific language capturing the basic statutory requirement of a formal therapeutic relationship, I believe the jury instructions as given allowed for an unduly broad understanding of the statute, risking the possibility the jury might have concluded the statute reached conduct even in the absence of the required *467 specialized relationship. See, e.g., Pub. Citizen v. U.S. Dep’t of Justice, 491 U.S. 440, 452-54, 109 S.Ct. 2558, 2566-67, 105 L.Ed.2d 377, 390-92 (1989) (explaining reliance on statutory definition was “not entirely satisfactory” and looking for “other evidence of congressional intent to lend the term its proper scope”); Darryl K. Brown, Regulating Decision Effects of Legally Sufficient Jury Instructions, 73 S. Cal. L.Rev. 1105, 1113 (2000) (noting two or more “formally equivalent” descriptions of statutory element often lead “decisionmak-ers to different choices” because “one presentation triggers inferences and assumptions that change its effective meaning”); Peter Tiersma, The Rocky Road to Legal Reform: Improving the Language of Jury Instructions, 66 Brook. L.Rev. 1081,1102-03 (2001) (noting model instruction committee will often recommend use of both statutory term and more ordinary meaning because jurors may be as familiar with statutory term and because ordinary meaning may not be “close enough in meaning”); cf. United States v. Kozminski, 487 U.S. 931, 969-70, 108 S.Ct. 2751, 2774, 101 L.Ed.2d 788, 822 (1988) (Stevens, J., concurring) (“In my view, individuals attempting to conform their conduct to the rule of law, prosecutors, and jurors are just as capable of understanding and applying the term ‘involuntary servitude’ as they are of applying the concept of ‘slave-like condition.’ Moreover, to the extent ‘slavelike condition of servitude’ means something less than ‘involuntary servitude,’ I see no basis for reading the statute more narrowly than written.”).
Similarly, Edouard’s request for an enumeration of the specific categories of mental health professions in the statutory definition of “counselor or therapist” duplicated the applicable statutory language, and would have provided important context for understanding the types of relationships covered by section 709.15. The statutory definition does not merely implicate clergy and any other person who might purport to provide mental health services, as the definitions offered by the district court and majority suggest. Instead, the definition sets forth an illuminating list of specific categories of professionals who provide mental health services, while excluding other classes of actors who might also engage in relationships with emotional or related underpinnings. This definition, as I have explained, is crucial context for an appropriate understanding of section 709.15. Section 709.15 covers not just any relationship involving an enumerated professional and having some mental health component, but only those relationships in which the provider and an emotionally dependent client or patient (or former client or patient) have engaged in a formal therapeutic mental health relationship. The statute’s itemization of the professionals who commonly provide mental health services emphasizes the importance of the existence of a formal therapeutic relationship as a key feature of the state’s burden of proof and Edouard’s defense. In my view, the district court’s omission from the instructions of Edouard’s request for the statutory itemization of professionals providing such professional services left the jury with an unduly broad understanding of the statute’s circumscribed reach. See, e.g., Sorg, 269 N.W.2d at 132 (“Under the applicable rule of Noscitur a sociis, the meaning of a word in a statute is ascertained in light of the meaning of words with which it is associated.”); State v. Roggenkamp, 153 Wash.2d 614, 106 P.3d 196, 200 (2005) (explaining “shelter” in the phrase “food, water, shelter, clothing, and medically necessary health care ... should not be isolated and analyzed apart from the words sur *468 rounding it”); see also United States v. Zimmerman, 943 F.2d 1204, 1213 (10th Cir.1991) (requiring instructions to “state the law which governs” and provide “the jury with an ample understanding of the issues and standards applicable” (internal quotation marks omitted)); Robert W. Rieber & William A. Stewart, The Interactions of the Language Sciences and the Law, 606 Annals N.Y. Acad. Sci. 1, 2 (1990) (“In more than one instance, linguistics and the law have independently discovered the same principles of language. For example, the legal canon of construction noscitur a sociis (indicating that the meaning of words is to be known from the other words with which they are associated) is, in essence, the semanticist’s principle of contextual constraints on lexical meaning.”).
Finally, Edouard’s request for specific definitions of “counseling,” “treatment,” and “assessment” duplicated the definitions we set forth in Gonzalez, and was clearly applicable to his defense. The definitions would have provided additional important context for the jury, conveying the technical nature of these terms and their close association with professional diagnosis and treatment of emotional and cognitive dysfunctions affecting clients or patients. While the Gonzalez definitions need not constitute exhaustive definitions for purposes of section 709.15 analysis, they do accurately convey the general statutory meaning, and they do clearly bound the universe of acceptable interpretations of mental health services in implicating only specific classes of formal therapeutic relationships. See Gonzalez, 718 N.W.2d at 308-09 (emphasizing therapeutic relationship, therapeutic environment, and formal psychiatric environment). The omission of these definitions or any related indication of the technical meaning of mental health services in the jury instructions given by the district court again raises the risk of an unduly broad understanding of the statute.
Because the jury instructions failed to convey these important legal limiting principles, I would conclude the district court erred in refusing to submit Edouard’s proposed instructions. See Marin, 788 N.W.2d at 837. Instructional errors of this kind, we have previously explained, warrant reversal unless the record demonstrates an absence of prejudice. State v. Frei, 831 N.W.2d 70, 73 (Iowa 2013). For errors of nonconstitutional magnitude, we have noted prejudice is established when it appears the rights of the complaining party have been injuriously affected, or it appears the party has suffered a miscarriage of justice. Id. The omission of the requested instructions here failed to ensure the jury would apply each of the distinct statutory elements substantiating a formal professional therapeutic relationship in evaluating Edouard’s defense he had never engaged in a relationship of the kind contemplated by the statute. A failure of that nature, we have often said, will establish prejudice. See, e.g., State v. Kellogg, 542 N.W.2d 514, 518 (Iowa 1996) (reversing conviction of domestic abuse assault where jury instruction failed to explicitly enumerate all relevant indicia of cohabitation). Analyzing the instructional error here in conjunction with the eviden-tiary error I discuss next, I conclude the record conclusively establishes prejudice.
B. Expert Testimony. Turning to the first of Edouard’s evidentiary challenges, I note the district court limited Dr. Wake-field’s proposed expert testimony regarding the differences between pastoral care and pastoral counseling, on the ground it would be unhelpful to the jury and would usurp the “function of the jury.” At the outset, I note we have often emphasized our commitment to a liberal view on the admissibility of expert testimony. Leaf v. *469 Goodyear Tire & Rubber Co., 590 N.W.2d 525, 531 (Iowa 1999). For purposes of determining the admissibility of expert evidence, we have recently explained, it is of no moment that testimony addresses “ ‘an ultimate issue to be decided by the trier of fact.’” See In re Det. of Palmer, 691 N.W.2d 413, 419 (Iowa 2005) (quoting Iowa R. Evid. 5.704). Instead, we noted, our evidence rules compel us to consider whether the evidence meets our other longstanding evidentiary requirements. Id. The problem with a specific subset of expert testimony offered in a form embracing a legal conclusion, we emphasized, is “not that the opinion” may usurp the function “of the jury,” but rather that it may conflict with the responsibility of the court to determine applicable law and to instruct the jury accordingly. Id. To determine whether that conflict exists, we explained, we must look to standard evi-dentiary inquiries: the question of whether the evidence is helpful to the fact finder, the likelihood of misunderstanding by the fact finder of the legal terms used, and the question of whether the factual basis for any legal terms used has been adequately developed. Id. at 419-20.
Focusing attention on the appropriate inquiries, I note we have often looked for guidance to the approaches other jurisdictions have taken in analyzing their own closely related rules of evidence. See id. (noting Iowa Rule of Evidence 5.704 is “identical to its federal counterpart,” and analyzing federal caselaw and standard evidence treatises). Several authorities have set forth principles applicable to our helpfulness analysis here. Courts have explained, for example, that expert testimony is generally helpful where it relates to subject matter outside the common experience of the jury. See, e.g., Fed. Crop Ins. Corp. v. Hester, 765 F.2d 723, 728 (8th Cir.1985) (noting admissibility of expert testimony regarding farm production on this basis); United States v. Johnson, 735 F.2d 1200, 1202 (9th Cir.1984) (“The federal courts uniformly hold ... that government agents or similar persons may testify as to the general practices of criminals to establish the defendant’s modus operandi. Such evidence helps the jury to understand complex criminal activities, and alerts it to the possibility that combinations of seemingly innocuous events may indicate criminal behavior.”). Expert testimony regarding business practices and customs unfamiliar to the general public has therefore often been deemed admissible. See, e.g., United States v. Mclver, 470 F.3d 550, 560-62 (4th Cir.2006) (concluding expert testimony that physician treated patients outside course of legitimate medical practice was admissible); United States v. Perkins, 470 F.3d 150, 159-60 (4th Cir.2006) (permitting testimony regarding reasonableness of use of force, explaining touchstone was whether testimony was helpful to jury, and noting questioning focused on witness’s “personal” assessment of defendant’s use of force); Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 218-19 (3d Cir.2006) (explaining testimony regarding securities industry practice and custom was admissible and probative of buyer’s state of mind at time of agreement); United States v. Mohr, 318 F.3d 613, 624-25 (4th Cir.2003) (explaining expert testimony that use of police dog “violated ‘prevailing police practices’ ” did not impermissibly tell jury “ “what decision to reach’ ”); TCBY Sys., Inc. v. RSP Co., 33 F.3d 925, 929 (8th Cir.1994) (permitting testimony in action for breach of franchise agreement that franchisor’s site-review- and-evaluation process failed to meet minimum custom and practice observed by franchisors in fast food franchise industry); State v. LaCount, 310 Wis.2d 85, 750 N.W.2d 780, 787-88 (2008) (permitting testimony regarding the basic factual eharac- *470 teristics of an investment contract to assist the jury in determining whether a transaction involved a security).
In my view, Dr. Wakefield’s testimony was of a type that would have been helpful to the jury on multiple levels. First, as Edouard was a pastor rather than a psychiatrist, psychologist, or social worker, Dr. Wakefield would have provided important context for the jury. Unlike the other typical providers of mental health services, pastors spend much of their time providing pastoral care that falls outside the statutory definition of mental health services. Edouard’s defense turned on the jury understanding that pastors interact with their parishioners in countless ways that— although often very supportive and beneficial — do not constitute “mental health services” as contemplated in section 709.15. The district court’s ruling denied the jury this helpful information that was essential to Edouard’s theory of defense, and outside the jury’s common understanding.
Even where proposed testimony falls generally within the common understanding of the jury, authorities have typically agreed testimony may be helpful when it offers specialized knowledge. See, e.g., Kopf v. Skyrm, 998 F.2d 374, 377 (4th Cir.1993) (“The subject matter of Rule 702 testimony need not be arcane or even especially difficult to comprehend. If, again in the disjunctive, the proposed testimony will recount or employ ‘scientific, technical, or other specialized knowledge,’ it is a proper subject.”); 7 Wigmore on Evidence § 1923, at 31-32 (Chadbourn rev. 1978) (“The true test of the admissibility of such testimony is not whether the subject matter is common or uncommon, or whether many persons or few have some knowledge of the matter, but it is whether the witnesses offered as experts have any peculiar knowledge or experience, not common to the world, which renders their opinions founded on such knowledge or experience any aid to the Court or jury in determining the questions at issue.”). Likewise, where the fact finder may have some knowledge of particular subject matter, but the knowledge may be incomplete or inaccurate, courts have recognized expert testimony may be helpful. See, e.g., United States v. Amuso, 21 F.3d 1251, 1264 (2d Cir.1994) (“Despite the prevalence of organized crime stories in the news and popular media, [crime family structure and terminology] remain proper subjects for expert testimony.”). In this case, Dr. Wakefield’s knowledge of the important distinction between pastoral care and mental health counseling provided by pastors was specialized information that would have been helpful to the jury in sorting out whether Edouard engaged, or purported to engage, in counseling as the term is defined in section 709.15. Although jurors might be expected to have some general knowledge about tasks commonly performed by pastors, their knowledge of the distinction between pastoral care and pastoral counseling that could have been illuminated by Dr. Wakefield was likely incomplete or inaccurate. Dr. Wakefield’s testimony could have minimized the risk jurors harbored a misunderstanding that counseling by pastors within the circumscribed meaning of section 709.15 extends beyond professional therapeutic relationships with emotionally dependent patients or clients receiving mental health services. Just -as the evidence would have assisted the jury, it would have been very helpful to the defense in this case.
The majority perfunctorily rejects Edouard’s proffer of Dr. Wakefield’s testimony as an effort to redefine mental health services in a manner incompatible with the meaning of section 709.15 and opine that Edouard didn’t provide them. I strongly disagree with this characterization. The effort was instead calculated to *471 communicate specialized knowledge about mental health services provided by pastors in formal therapeutic relationships with clients or patients. The effort was to educate the jury that the same definition of counseling and mental health services applicable to a psychiatrist, psychologist, or social worker in a prosecution under section 709.15 should be applied against Edouard as a pastor. In other words, the defense sought through Dr. Wakefield’s testimony to guard against the distinct possibility that the jury might misunderstand that “counseling” has a much broader meaning in the pastoral context than in other professional contexts. Accordingly, I believe the majority misses the mark when it asserts Edouard’s offer of expert testimony was calculated to redefine the statutory standard. The offer was absolutely consistent with the statutory framework’s central limiting principles, and should have been received.
Further, where no other evidence is available on an issue, courts have explained expert testimony may be crucial to the fact finder’s understanding. See, e.g., Harris v. Pac. Floor Mach. Mfg. Co., 856 F.2d 64, 67-68 (8th Cir.1988) (noting distinction between testimony regarding criteria by which expert would form an opinion about the adequacy of a warning, which was important to fact finder’s understanding, and direct testimony regarding adequacy of warnings, which failed to provide similar aid). No other trial witness supplied the specialized knowledge offered by Dr. Wakefield.
Perhaps most importantly, courts have recognized the importance of the issue to which expert testimony relates is a significant factor in assessing the testimony’s helpfulness. See, e.g., United States v. Alexander, 816 F.2d 164, 167-69 (5th Cir. 1987) (explaining district court erred in excluding evidence bearing directly on issue central to determination of defendant’s guilt). In my view, the majority completely misapprehends the crucial significance of this evidence to the defense. There was no more important witness for Edouard in this case than Dr. Wakefield, who offered specialized knowledge illuminating what mental health counseling looks like when it is provided by a pastor to parishioners who are his clients or patients.
Courts have also articulated useful principles for analyzing the likelihood of jury confusion and the question of whether adequate factual basis for any testimony has been developed. As we explained in Palmer, we are most frequently concerned with opinions implicating legal standards and terminology when the fact finder may not understand the legal definitions of the terms and standards used. Palmer, 691 N.W.2d at 419. Various courts have elaborated on this concern, noting where testimony fails to explain how tests and terms with legal meaning relate to the facts in the case, the fact finder may not under-' stand the testimony or may attribute a meaning unintended by the witness. See, e.g., United States v. Simpson, 7 F.3d 186, 188-89 (10th Cir.1998) (‘When an expert merely states an opinion on an ultimate issue without adequately exploring the criteria upon which the opinion is based, the jury is provided with no independent means by which it can reach its own conclusion or give proper weight to the expert testimony.”). Thus, courts have explained, experts may often avoid the problem of confusion by employing language that does not have unrelated meaning under the law applicable to the case. See, e.g., United States v. Duncan, 42 F.3d 97, 103 (2d Cir.1994) (permitting testimony about defendant’s submission of false tax returns, where witness did not rely specifically on terms derived directly from statutory language but, instead, used terms laypersons could understand). Dr. Wakefield’s testi *472 mony was, as I have suggested above, clearly calculated to eliminate jurors’ confusion surrounding the nature and extent of mental health services provided by pastors.
Similarly, experts have avoided problems of confusion by using language with a meaning accessible to laypeople, by using language having the same lay meaning as the legal meaning, or by clearly signifying the use of a specific meaning when the lay and legal meanings differ. See, e.g., United States v. Nixon, 918 F.2d 895, 905 (11th Cir.1990) (“Considered in context, the police detective’s use of the term ‘conspiracy was a factual — not a legal — conclusion and did not , track unduly the definition of the offense in [the relevant statute].”); United States v. Kelly, 679 F.2d 185, 136 (8th Cir.1982) (permitting narcotics officer’s testimony that quantity of cocaine found on defendant at time of arrest was “a quantity that would be possessed with intent to distribute”); Maury R. dicker, Comment, The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?, 42 U. Miami L.Rev. 881, 872 (1988) (“There is yet another group of cases [admitting opinion testimony] in which the court found that, although the witness reached a conclusion using a term of law, his statement must properly be understood in another context, completely disregarding the legal meaning. This is not quite the same as saying that the jury will not be confused because it will automatically tend to attach the correct meaning to the term. Instead, the court is saying that because of the broader context of the witness’s testimony, the jury will understand that he did not mean the word in a legal sense but in some other sense.”). Dr. Wakefield’s testimony on the important distinction between pastoral care and pastoral counseling would not, in my view, have increased the risk of jury confusion. On the contrary, her explication of the context in which pastors — like other mental health professionals — provide mental health services to emotionally dependent patients or clients in a formal therapeutic environment was expressed in . words entirely consistent with the carefully circumscribed meaning of the essential terms within section 709.15.
Finally, various courts have explained the distinction between admissible factual opinion and impermissible legal conclusion may often be difficult to perceive based on the overlap of the terms used. In these cases, cognizant of the potential for confusion, courts have nevertheless often allowed, the proposed testimony, explaining “[m]edical and legal terms often overlap, and a medical expert cannot be expected to use different words merely to avoid this specific problem.” See, e.g., United States v. Two Eagle, 318 F.3d 785, 793 (8th Cir. 2003); Hagen Ins. Inc. v. Roller, 139 P.3d 1216, 1222-23 (Alaska 2006). Fairness and efficiency concerns will often dictate admissibility, courts have explained, as long as the testimony is confined to relevant issues, is based on proper legal concepts, and meets the other requirements of the rules of evidence. See, e.g., First Nat’l State Bank of N.J. v. Reliance Elec. Co., 668 F.2d 725, 731 (3d Cir.1981) (permitting testimony regarding trade usage of terms having legal meaning, to inform jury of bank customs and to assist it in determining whether plaintiff bank was entitled to claim benefits of holder in due course); Birchfield v. Texarkana Mem’l Hosp., 747 S.W.2d 361, 365 (Tex.1987).
In summary, I conclude Dr. Wakefield’s proposed testimony about the differences between pastoral care and pastoral counseling addressed subject matter not commonly known to the jury, contained specialized knowledge of the range and types of tasks typically performed in each pastoral role, and constituted the only means by which the jury could have gathered this *473 information of central importance to the defense. Those factors, the courts have explained, are indicative of helpfulness, and weigh heavily in favor of admissibility. See, e.g., Kopf, 993 F.2d at 377; 7 Wig-more on Evidence § 1923, at 31-32. Moreover, Dr. Wakefield’s testimony was central to Edouard’s defense. Her testimony was offered to explain the types of tasks Edouard might typically be expected to perform in his role as a pastoral caregiver, distinguishing those tasks from the types of tasks he might be expected to perform in a role as pastoral counselor. In furtherance of this distinction, Dr. Wakefield’s proposed testimony would have supported an inference that the tasks in the latter role would closely track the types of services provided by other mental health services professionals under section 709.15. This factual background was directly relevant to the jury’s evaluation of Edouard’s defense that, although his conduct could be viewed as pastoral care, he did not provide mental health services as contemplated by the statute. Exclusion of crucial background information of this kind, courts have explained, may often constitute reversible error. See, e.g., Alexander, 816 F.2d at 169 (“The entire case against Victor Alexander turned on the photographic identification, and it was clearly erroneous for the district court to exclude without good reason relevant expert testimony bearing directly on that issue.”); State v. Eichman, 155 Wis.2d 552, 456 N.W.2d 143, 150 (1990) (concluding sexual exploitation case was “particularly appropriate for the admission of expert testimony” explaining certain specific practices of psychotherapy and the defendant’s typical responsibilities, on the ground the factual background regarding these practices and responsibilities would not typically be “within the understanding of the ordinary person”).
Furthermore, I note the distinction between pastoral care and pastoral counseling detailed in Dr. Wakefield’s proposed testimony presented minimal risk the jury would inappropriately confuse the terms and standards she proposed to use with those provided in section 709.15. The statute makes no reference, in any provision, to pastoral care or pastoral counseling. In addition, her use of the word “pastoral” to modify the word counseling helped to alleviate concern the jury might be unable to distinguish her use of “pastoral counseling” from the statute’s use of the word “counseling.” Her description of the role of the pastoral counselor also worked to minimize the risk of inappropriate confusion, given her exposition of the tasks and techniques involved, and the fact that these tasks and techniques largely coincided with those associated with the technical meaning of counseling incorporated in the statute. See Palmer, 691 N.W.2d at 421 (“[T]here was an abundance of testimony by Dr. Salter concerning the meaning of the term ‘likely.’ Under these circumstances, Dr. Salter’s use of the statutorily defined term ‘likely* did not render her opinion inadmissible.”); id. (explaining danger of jury confusion may arise when expert and jury are not “‘on the same page’ ” with respect to differing statutory and testimonial meaning).
Given the demonstrable helpfulness of Dr. Wakefield’s proposed testimony, its central importance to Edouard’s defense, the minimal likelihood the jury might confuse the meanings of the terms used with unrelated lay meanings, and the extensive factual basis for the use of those terms overlapping with the statutory terms, I conclude the district court erred in excluding the testimony. As is the case with instructional error, I would presume the evidentiary error was prejudicial and requires reversal unless the record affirmatively establishes lack of prejudice. See, e.g., State v. Paredes, 775 N.W.2d 554, 571 (Iowa 2009). For evidentiary errors of constitutional magnitude, we may only find *474 the absence of prejudice if we are convinced the “error alleged was harmless beyond a reasonable doubt.” See, e.g., State v. Simmons, 714 N.W.2d 264, 278 (Iowa 2006).
Regardless whether the error here rises to the level of constitutional magnitude, I cannot conclude the record affirmatively establishes the absence of prejudice. The evidence would have provided helpful factual information for the jury directly related to Edouard’s defense that he was not engaged in the kinds of formal therapeutic relationships contemplated by the statute, and the evidence was unavailable from any other source. The instructional error compounded the impact of the exclusion, as the jury was left without both important factual nuance for distinguishing certain specific classes of relationships from others and important legal nuance for application of the relevant statutory principles to the types of relationships considered. In effect, the jury here was deprived of both factual principles and legal principles acutely relevant to the defense. Those deprivations, I conclude, conclusively establish prejudice and warrant reversal.[12]
I join that part of Justice Appel’s special concurrence setting forth the analytical approach we take in addressing an issue under the Iowa Constitution where a party also raises the issue under the corollary provision of the Federal Constitution, but does not suggest application of a different standard, or suggest a different application, under the Iowa Constitution.
WIGGINS, J., joins this concurrence in part and dissent in part.

. After adopting its sweeping interpretation in lieu of the narrower one I favor, however, the majority attempts to sidestep these issues by asserting several times, inaccurately in my view, that Edouard has failed to raise over-breadth and vagueness arguments on appeal. I believe a few observations are warranted here.
In the jury instruction colloquy in the district court, Edouard argued "[t]he scope of mental health services and the scope of the statute is overbroad, in that it covers protected activities” and "the definition and scope of mental health services is unconstitutionally vague.” In both his pretrial motion to dismiss and his posttrial motion for arrest of judgment, he argued the Federal Constitution and the Iowa Constitution provide protection against legislative acts that interfere "with certain fundamental rights and liberty interests.” On appeal, Edouard advances several specific overbreadth arguments. For example, he argues that under the State's proffered definition of mental health services, "eveiy person would have a mental health dysfunction.” Relatedly, he argues "[t]he constitutional flaw in the statute as applied in the State’s theoiy of prosecution is that it presumes an unequal power balance merely from Edouard’s status as a member of the clergy.” In addition, Edouard cites very prominently in his constitutional analysis Roe v. Wade, 410 U.S. 113, 164, 93 S.Ct. 705, 732, 35 L.Ed.2d 147, 183 (1973). By most accounts, Roe was an overbreadth case, as the majority explained the Texas statute at issue ”swe[pt] too broadly,” and made "no distinction between abortions performed early in pregnancy and those performed later.” Id. at 164, 93 S.Ct. at 732, 35 L.Ed.2d at 183; see also Ada v. Guam Soc’y of Obstetricians and Gynecologists, 506 U.S. 1011, 1011, 113 S.Ct. 633, 634, 121 L.Ed.2d 564,-565 (1992) (Scalia, J„ dissenting) (explaining the Roe court "seemingly employed an 'overbreadth’ approach”). These features, among others, of Edouard’s appeal are indisputably overbreadth arguments in my view.
Similarly, Edouard's vagueness arguments abound on appeal. "If [the Gonzalez definition] does not apply, as the State suggests,” Edouard argues, "then what definition of ‘counseling’ should apply here?” Relatedly, he cites Knight, v. Iowa District Court, 269 N.W.2d 430, 433 (Iowa 1978), for the proposition that "criminal acts that are malum prohi-bitum must be delineated clearly and unequivocally.” And, as noted, he cites Roe, where the Court clearly explained it would not address a vagueness challenge only because the overbreadth grounds were disposi-tive. Roe, 410 U.S. at 164, 93 S.Ct. at 732, 35 L.Ed.2d at 183. Given these features of Edouard’s appeal and others, I do not believe we can seriously conclude Edouard has failed to advance a vagueness challenge here.
Finally, I would note I do not believe we can appropriately "compartmentalize” Edouard’s vagueness and overbreadth challenges for purposes of analysis here, as we have done many times without explanation in the past. See Smith v. Goguen, 415 U.S. 566, 577 n. 20, 94 S.Ct. 1242, 1249 n. 20, 39 L.Ed.2d 605, 614 n. 20 (1974) ("Appellant is correct in asserting that Goguen failed to compartmentalize in his state court brief the due process doctrine of vagueness and First Amendment concepts of overbreadth.... But permitting a degree of leakage between those particular adjoining compartments is understandable.”). As numerous authorities have recognized, the purpose of the special vague *464 ness variant applicable in First Amendment cases and other cases involving fundamental rights parallels that of both the "ordinary” vagueness doctrine and the "ordinary” over-breadth doctrine: Each is designed "to avoid the chilling of constitutionally protected expression and to reduce the possibility that an open-ended delegation of authority may lead to selective enforcement against unpopular causes.” Richard H. Fallon, Jr., Making Sense of Overbreadth, 100 Yale LJ. 853, 904 (1991) [hereinafter Fallon] (footnotes omitted) (internal quotation marks omitted); see also Kolender v. Lawson, 461 U.S. 352, 358 n. 8, 103 S.Ct. 1855, 1859 n. 8, 75 L.Ed.2d 903, 910 n. 8 (1983) ("[W]e have traditionally viewed vagueness and overbreadth as logically related and similar doctrines.”); Goguen, 415 U.S. at 573, 94 S.Ct. at 1247, 39 L.Ed.2d at 612 ("Where a statute’s literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the [vagueness] doctrine demands a greater degree of specificity than in other contexts.”); cf. Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L.Rev. 235, 276 (1993) ("In fact, the Court has been applying overbreadth analysis in substantive due process cases for quite some time, albeit without expressly stating as much.”). Thus, it may well be that in a case like this one, Edouard's vagueness challenge is "best conceptualized as a subpart of First Amendment overbreadth doctrine.” See Fallon, 100 Yale LJ. at 904. Regardless the conceptualization, however, I believe Edouard, in addressing the broad interpretation the majority adopts with specific vagueness and over-breadth arguments, has asserted his "right not to be burdened by an unconstitutional rule of law." Henry Paul Monaghan, Over-breadth, 1981 Sup.Ct. Rev. 1, 4 (1981) ("[A]n overbreadth litigant [does not] invoke the rights of third parties; as ‘a theoretical matter the [overbreadth] claimant is asserting his own right not to be burdened by an unconstitutional rule of law, though naturally the claim is not one which depends on the privileged character of his own conduct.”); see also William A. Fletcher, The Structure of Standing, 98 Yale LJ. 221, 244 (1988) ("[Someone who makes an overbreadth challenge to a statute] is not directly asserting [an]other person’s rights to engage in protected conduct; rather, she is asserting her right to be free from control by an invalid statute.”); Marc E. Isserles, Overcoming Overbreadth: Facial Challenges and the Valid Rule Requirement, 48 Am. U.L.Rev. 359, 367 (1998) ("Thus, the overbreadth challenger might claim that he or she is asserting a personal right to be free from prosecution because an overbroad law that permits some unconstitutional applications cannot be enforced against anyone.”).

. Because I conclude my resolution of the instructional and evidentiary challenges is dispositive of the outcome here, I will not address Edouard’s remaining challenges on appeal.